All right. Mr. Young, you're up, sir. Thank you, Chief Judge Stewart, and may it please the Court, this is one of the receiver's fraudulent transfer actions flowing from the collapse of the Stanford Ponzi scheme. In October 2008, less than four months before that collapse, Gary Magnus and entities under his control took $88 million from Stanford International Bank. At trial, Magnus did not dispute that those transfers were fraudulent transfers under TUFTA, the Texas Uniform Fraudulent Transfer Act. Instead, the only issue at trial was whether Magnus could satisfy TUFTA's good-faith affirmative defense, thereby allowing him to keep all the money instead of returning it to the receiver for pro rata distribution to be shared among all of the defrauded victims of the scheme. The jury found that at the time Magnus took the money, he was on inquiry notice that Stanford was a Ponzi scheme. And based on that finding, the district court should have entered judgment on the verdict for the receiver, who should today be the appellee sitting over there rather than the appellant sitting over here. In fact, none of the receiver's four arguments for reversal turns on any error on the part of the jury or challenges the sufficiency of the evidence. And I hope to be able to address all four of our points, at least briefly today, two rendition points, two new trial points. But I'd like to start with why the court should render judgment or direct entry of judgment for the receiver on the verdict based on that inquiry notice finding and whether it should do so turns on a pure question of law, whether there is a so-called futility exception by which someone can be deemed to have taken a transfer in good faith despite, first, being on inquiry notice of fraudulent intent and, second, failing to then undertake a diligent investigation that allayed those fears. And the answer should be no for at least four reasons. The first is the statutory text, which provides for no such futility exception. Good faith is the exception. Without it, as a gift from the Texas legislature, someone who is on inquiry notice of fraudulent intent must give the money back to the receiver. That good faith exception is a benefit that a transferee must prove his entitlement to. If you have, as the cases hold, a duty upon being on inquiry notice to diligently investigate, the way to discharge the duty to investigate is to investigate. A transferee ought to look at the duty of a diligent investigation as an opportunity, a last chance. A diligent inquiry is your final opportunity to stop being on notice. Second, an investigation is never actually futile at the only time that matters, which is at the time of the transfer. Tufte's affirmative defense of good faith says that if a transferee takes, took, in good faith, when they took that money, then they may be able to keep it. But at the time of the transfer, when you're on inquiry notice, you cannot possibly know that it would be futile to investigate. You cannot possibly know what your investigation would reveal. Would it allay your concerns? Would it confirm your concerns? Would it deepen them and reveal things that you didn't even dream of despite being on inquiry notice of something? There is no way that a defendant on inquiry notice could possibly confirm that it would be futile, because if so, he wouldn't be on inquiry notice. You cannot know that it would not be confirmed, and therefore, sitting back on your investigating is the very definition of bad faith and not good faith. And there's another corollary to that, and that is that whatever you learn is not useless. If you're on inquiry notice of fraud or insolvency, here a Ponzi scheme, and you get up and investigate and your concerns are allayed, that's a useful piece of information. If they are deepened, that's a useful piece of information. It is never futile for someone who's on inquiry notice to undertake the duty of a diligent investigation. Third, and unsurprisingly given the foregoing, there is no tuft of case from this Court, from the Texas courts, from any court that so much as hints at the existence of a futility exception, except from the court below and in this receivership. Cases do, however, describe the good faith obligation as imposing this diligent investigation duty, and they make clear that that duty is to prevent willful blindness. An objective term applied to someone who does nothing, who is therefore ascribed all the knowledge that turns out later to be true precisely because Tufta seeks to encourage investigation rather than to discourage it. The pattern jury charge, cases from this Court, GE Capital, cases from Texas Court, Hahn v. Love, cases from the Supreme Court in a pre-Tufta or even Ufta time, but based on the same Elizabethan-era concepts of good faith, repeatedly state that when you're on inquiry notice, your duty is to diligently investigate, and the shower case that we've cited to you actually said that if you fail to do so, game over. Lastly, my final point as to why there is no futility exception today is that it does encourage the transferees to avoid any diligent investigation, thereby depriving the public, the government, other investors of the opportunity to have fraud uncovered more quickly. In fact — I expect you agree that if we agree with you on your second issue, your rendition point about futility exception, that we can resolve the entire case, the whole kit and caboodle on that issue. Absolutely. It's an independent rendition point, but I would ask that the Court, if it does this and I think it should do this, because there are still many fraudulent transfer cases pending in the Court below and there will be receiverships to come. As it does so, the question becomes, what is the transferee on inquiry notice of? And so even though this rendition point disposes of the case in resolving it and answering it, I think the Court should say that the instructions were erroneous. Now, with respect to inquiry notice, the jury still got it. Even though it increased the burden on the receiver, who did not bear the burden of proof, it moved the goalposts right up to Magnus, who did bear the burden of proof. By saying Ponzi scheme, the jury in this case was actually able to say, yes, they were on inquiry notice of a Ponzi scheme. But that may not always be the case. And certainly with respect to actual notice, it was prejudicial and harmful to the receiver. It won't matter if you resolve it, Judge Willett, on this point, as you suggest. But for the guidance that you're going to provide in future cases, the point is that as the pattern jury instruction in Texas says, as all the cases say, as this Court's decisions in Ray American Housing Foundation, GE Capital say, the question is whether or not they're on inquiry notice of fraud or insolvency, not Ponzi scheme, not money laundering, not securities fraud or something else that turns out later in the day to have been what the fraud was. Because, again, it's a timing problem. When you're on inquiry notice, you can't possibly forecast with your crystal ball and see what the specific kind of fraud will turn out to be. Instead, your job is to say, I'm on inquiry notice. I now need, if I'm going to keep this money, instead of sharing it with all these other people who are going to get pennies on the dollar instead of me getting a dollar on the dollar, I need to allay concerns of fraud or insolvency. And in this case, there was ample evidence in the record to say that the jury could have found that it was fraud or insolvency, even if, with respect to the actual notice question, for example, which would be a new trial point, they didn't say they were on actual notice of a Ponzi scheme. If I might, you know, just briefly address some of those other points, Your Honor, the Ponzi instruction, regardless of whether you address it in the context of a rendition point or a new trial point, we hope it's a rendition point, of course, it should be clear to everyone, and I hope will be clear from this Court's opinion, that when receivers are bringing claims for fraudulent transfer and a defendant invokes the good faith defense, that the instruction should not be one that unduly lessens the burden on that defendant in the way that was done by this instruction here. We have an additional point on new trial. Again, I hope that you won't need to reach this because we think that you should render a direct entry of judgment. But four days before the trial began, the Thursday before the Monday trial, the district court, sua sponte, reversed its own denial of summary judgment on unjust enrichment. And this is an important point as well. It may well arise in future cases if you reverse and render. You don't need to address it, although it's something that I fear will come before you again in some other case. And that is that the district court made three statements at that pre-trial conference that explained why he was taking from the receiver the constitutional right to a jury to decide that question. First, that Magnus just got his own money back, so it wasn't enrichment as a matter of law. That clearly is wrong as a matter of law, because a Ponzi scheme by definition means that you're never getting your own money back. That's the whole point, is you're getting somebody else's money. The district court also held that it was a duplicative statutory remedy just with a higher burden on the receiver, and thought that the receiver's agenda in bringing an unjust enrichment claim was simply to be able to go first. It was odd to flip the order, but that isn't the primary agenda. The primary agenda the receiver had was to be able to obtain relief under unjust enrichment should the jury not rule for him under Tufta. And the idea that it's a duplicative statutory remedy is itself erroneous as a matter of law, because, for example, unjust enrichment does not focus, as I've said several times, the way that Tufta does at the moment of the transfer. Unjust enrichment asks at the time of the lawsuit, do you have something that doesn't belong to you and that equity and good conscience says belong to someone else? And so, for example, just to make one brief point, the jury could well have said, well, we cannot find that Magnus was on notice in October of 2008, but by January of 2009, when he's scrambling around to get Stanford, which at this point itself is scrambling around, as all three members of this panel know, having heard these cases either on this Court or another Court, they were scrambling to do whatever they could to stave off defeat, and so they agreed to cancel out these loans that were taken. Well, that set of transactions could well be something that a jury could have said is not relevant to Tufta, but might well be relevant to unjust enrichment. Unjust enrichment does not have a good-faith defense. That is not something that is essential for establishing unjust enrichment as an equitable standard that the receiver should have had the opportunity to present to the jury, if you render judgment for us, it doesn't matter in this And then lastly, I'll just say a moment. I'm happy to rest on the briefs on our estoppel point. I do think that there is no good way to read the English words in the Forms 8275 that were filed for Tax Year 2008. Due to the investigation in October of 2008, I took this money. I was scared about the loss of my principal. I feared that my principal in a bank was in jeopardy. And when you have money in a supposedly safe, world-class, rock-solid, platinum bank, and you fear that your principal is in jeopardy, which means at risk of loss, that can only be because you fear that it is insolvent. And in fact, there is ample evidence in this record that the Magnus parties had just that notice, that they were able to conclude that. But it wouldn't matter because he had said in those Forms 8275 that he was concerned about that, and thus, disputing that in this trial is something that he should be estopped from contending. You cannot simultaneously tell the IRS, I would like to save $8 million, which is what he saved, by saying I was concerned about the loss of my principal, therefore don't treat it as interest, which is what it was. Treat it as principal. I have no taxes. I save $8 million on it. And then telling a Federal court 10 years later, oh, I had no concerns at all about that. That's not what was on my mind at all. I thought it was the most amazing investment opportunity ever known to man at that point. Federal courts deserve better. They have the right and, indeed, the obligation to protect themselves from manipulation, as this Court has held in the Hall v. G.E. case. And I would suggest that this Court should consider the possibility of addressing that, because if it was good enough for a much more modest debtor, like Davidson, this Court's decision, bankruptcy case, alimony payments, small little case, it's got to be good enough for a billionaire who's trying to extract $8 million from the United States in a tax context, and then to extract $79 million after the net winnings from all the victims of this fraud so that he can keep the money. I'm 100 cents on the dollar. If there are no questions, I'll wait for a vote. All right. Thank you, sir. All right. We'll hear from Mr. Petrie first. Thank you. May it please the Court. My colleague, Rachel Mentz, is going to address the quasi-estoppel and the unjust enrichment matters. I'm going to address the judicial estoppel, the inquiry notice, and the instruction matters. And I'd like to start by putting down three foundational items on which we're relying. The first of those is, as this Court has already decided, the good faith standard, the good faith defense is decided on an objective basis, not a subjective basis. The second is this Court's previous rulings in both the DSCC case and in the 548A1 of the Bankruptcy Code is useful here. And that's because the Uniform Act was modeled on the Bankruptcy Code section, and Tufta, of course, follows from the Uniform Act. And the third foundational item I'd like to bring up is this Court, likewise in DSCC and in Brown, has previously noted that this was not discoverable, that no benefit of having the books and records and having Mr. Davis' guilty plea in that investor's hands. Here, however, we can go a step further because we had a seven-day jury trial in which all of these matters were presented. And at the close, as counsel has said, there's no challenge to the jury's finding at the close that this could not be discovered. It was incapable of being discovered. Now, building on those three blocks, obviously that touches on the judicial estoppel. I won't belabor that. The Court has already ruled this is not discoverable. If we look at, then, the next question, which is what is inquiry notice, it's actually, if you think about it in some respects, a misnomer. Inquiry notice is really constructive knowledge. What inquiry notice says is that if you have reason to inquire, then what you could have discovered with that inquiry is attributed to you. This is not novel. This is not new. The Third Circuit, the Seventh Circuit, the Eighth Circuit, the Ninth Circuit, the Tenth Circuit, have all laid down this two-part test that says inquiry notice, a reasonable person presented with these facts would go out and ask questions, and those questions would lead to the discovery of the fraud, the Ponzi scheme, whatever the particular issue is. I'm referring to Bressman, In re Bressman in the Third Circuit, In re Greed in the Seventh Circuit, In re Sherman in the Eighth, In re Agricultural Research in the Ninth, and Jobin, which is the In re M&L business machine case, in the Tenth Circuit. But let's start with Greed as sort of the poster child. That's a fairly recent case in the stack of the five that I've just given you. Because in that particular case, now the receiver comes back and says, well, that case didn't use the word futility, didn't even talk about it. What that case did instead was talk about whether it would have been fruitless. That's what the District Court said. We found it was fruitless for that particular entity, the transferee, to look at what was going on. The case came up to the Seventh Circuit, and the Seventh Circuit said, well, based on the findings of fact that the trial court has already entered, if we asked further questions, put on inquiry notice, and if they had asked those questions, would they have discovered the problem? Here, the District Court findings, evidence that actually the judge already found they had discovered the problem and knew it was there. So it ended up in a different place, but that was because it had different factual findings. Here we have, after a seven-day jury trial, the jury coming in, considering all the evidence, all the receiver's arguments, and saying no reasonable person could have discovered this Ponzi scheme. It was a very well-done fraud, as the receiver acknowledged. It was done by five people at Stanford, concealed from everybody else, employees, regulators, investors, et cetera. That's right out of Mr. Janvey's testimony. The next issue, then, is the instruction. Judge Godbee sat there for seven days, of course, and listened to the trial. And what Judge Godbee told the parties during the instruction conference and as part of the objections process that went on with the instructions is, you tried a Ponzi scheme case. That's what I'm going to instruct the jury on. Let me give you an example of sort of a key part of the record that I'm going to turn to in terms of how this case was presented as a Ponzi scheme case. I'm looking at pages 1, 8, 9, 7, 3, and 7, 4 of the record. This is the testimony of Carol Van Tassel, the forensic accountant who the receiver hired long ago, the receiver hired right out of the blocks, and has been working on this case for years and years and years. And what Ms. Van Tassel, on response to questions from counsel for the receiver, said was, Ponzi scheme is really just a type of financial fraud. Financial fraud at its common base is really that there's been some kind of false statement and a company has to make that false statement because they're covering up a lie. Either that there's assets that don't exist, there's sales that don't exist, maybe inventory, whatever that lie may be. And then her statement continues on a little bit. That's just an excerpt of it. But that's how the case was tried. And the proof of that is when you come down to the jury instructions. It's only after the trial that the receiver comes back and says, oh, we wanted to talk about different kinds of fraud and insolvency. And there was no evidence during the case about other types of fraud. That was why Judge Godbee ruled the way he did. And on insolvency, if you look through Ms. Van Tassel's testimony, she didn't speak to it at all. This is the forensic accountant. The forensic accountant did not come in and testify that looking at the evidence objectively, a reasonable person would have determined that the Stanford scheme was insolvent, or in our particular case, the Stanford International Bank was insolvent. And then when you get to the instructions, the receiver did not even ask for an instruction defining insolvency. And insolvency is not a concept that you can just throw out to a lay jury and expect them to understand it. This court has previously sat down. There's two ways to determine insolvency. That would have been guidance to the jury had that been an issue, and the receiver didn't ask for it. The receiver didn't, after the instructions were formed by Judge Godbee, didn't object on the basis of the absence of an insolvency instruction, and in the receiver's threadbare objection to the instructions, did not give any offer of what other evidence would have been adduced or what he would have tried to present that would have showed some different kind of fraud than the Ponzi scheme or that would have shown insolvency. And on those bases, we think the judge was entirely correct in, first of all, forming the two-part test, the second part of which, which says if you would investigate and could not discover what was there, or in other words, your own land inquiry notice of what was discoverable, that by definition includes futility. And that's not novel. We've pointed out other areas of Texas law where looking at inquiry notice slash constructive knowledge, that's what the law is. You're only responsible for what you should have known, and at that point in time, it doesn't matter whether you investigate or not. That's because that knowledge is deemed by law attributable to you. If you investigate it or not, that doesn't matter. If you conducted an investigation and it was excellent or it was poor or it was middling, that also doesn't matter. So the instruction was proper, the two-part step was proper, and we ask you to affirm on those bases. I'll turn over the podium to Ms. Metz unless there's any questions. All right. Thank you. May it please the Court, Rachel Metz on behalf of the Magnus Parties. This Court should affirm the district court's entry of judgment in favor of the Magnus Parties for two additional reasons, the first being that the district court properly granted summary judgment dismissing the receiver's unjust enrichment claim, and two, that the district court properly determined that quasi estoppel should not apply under the facts of this case. Turning first to the unjust enrichment claim, the Court should affirm the grant of summary judgment dismissing the unjust enrichment claim because an unjust enrichment claim does not exist under Texas law in the situation at issue here, where the receiver is trying to claw back principle. It's under the undisputed facts on summary judgment. The Magnus Parties essentially were getting back their own investment, and there is no unjust enrichment as a matter of law under Texas law of unjust enrichment for such a situation. What do you make of the authorities that the receiver cites in their brief? I think it's on page 23. Some Supreme Court of Texas authorities that seem to refer approvingly to unjust enrichment claims. So there are situations where clearly there can be an unjust enrichment claim in the context of a uniform flagellant transfer type situation. But in this particular situation, the facts are very different from those cases, and the receiver has not cited a single case where there was a clawback of principle under Texas law and there was a coterminous unjust enrichment claim and a Tufta claim. Your distinction is principle clawback. Yes. Okay. Yes. And specifically, if we look at the Texas authority where there has been an unjust enrichment claim in this context of a clawback of principle, in both of the two Texas cases that we've identified, Cote and Walker, they're both Texas court of appeals cases, they both reject an unjust enrichment claim in the context of return of principle because they, in those cases, the court looked at all of the circumstances, and it's a factually intensive determination that has to happen for an unjust enrichment claim. And they determined that in those cases, those investors acted in good faith and provided reasonably equivalent value, and there was no unjust enrichment claim there where it was a clawback of principle. And that's exactly what we have here. This is what was submitted to the jury as part of the Tufta claim, and the jury determined as part of the Tufta claim that there was good faith, and the judge had determined previously that there was reasonably equivalent value. And so, under the circumstances that we have here, it's not proper for there to be an unjust enrichment claim. It's sort of conceptually disingenuous, notwithstanding what one knew beforehand, that it's a Ponzi scheme, but by definition, it's a Ponzi scheme, and there's this universe of purloined monies that are all commingled and mixed and so forth. And if you're an investor and your money's in that mix, sort of the notion of getting a return on your investment seems a little odd because the notion of return on investment is, you know, you've been putting money in something that's bona fide, and as an accounting matter, you identify the numbers that match up with what you put in. But if what you put your money in turns out to be a fraud, a sham, it's poisoned money, it's whatever it is, then importing the concept of getting back out what on the spreadsheet looks equivalent to what you put into the fraudulent pot of money. Well, Your Honor, in this situation, this case where there's a lot of money, it seems convenient to be able to say I put in, you know, 50 million, I can identify 20, you know, and I get it back. Just kind of a straight in, straight out. But undeniably, where the money was placed was a Ponzi scheme. You know, it's a fraud, it's all of that. So his money being mixed in with a whole bunch of other purloined, poisoned scheme money, there's a little bit of dissonance between just being able to make the bookkeeping entry to say I can identify this amount and getting out when, in fact, your money has been immersed in this whole pot of scheme money. You see what I mean? And so this, maybe you're right, but in just the few cases I read, I mean, it just doesn't seem quite as smooth as you put it. Disavow me. I'm sure I'm wrong. Well, Your Honor, it's clear that the dollars that went into the scheme and that the dollars that came out of the scheme didn't have people's names on them, as the district court noted. But if you look at the law under the Uniform Fraudulent Transfer Act cases, as this Court looked in the UFTA context, in Jan V. V. Brown determined, there is no Tufta claim for every claim to clawback principle, okay? It's only for net winnings, and because of the good-faith defense. And in this case, when you look at the unjust enrichment context, similarly under Texas law, there's not any precedent where the Court has allowed this sort of equitable in unjust enrichment to just because it would be generally fair. And, in fact, the case law specifically says unjust enrichment does not lie because it would just be generally fair. You have to show fraud, duress, or the taking of undue advantage. And in this situation where the Magnus parties established that they acted in good faith, it's not appropriate to clawback principle under Texas law. And I'll point out two cases that the receiver points to where there was an example of an UFTA claim as well as an unjust enrichment claim, and they illustrate how this situation is different from the situations in those cases. And these are In re Valenti and Klein v. Beck. And in both of those cases, the UFTA claim was not displaced because we had a — there was a situation in those cases different than the one here. It was — neither of those cases involved the clawback of principle. In Klein v. Beck, it was specifically the interest that was clawed back on an unjust enrichment claim. And the reason why that had to happen in the unjust enrichment claim and not under the UFTA claim in that case was because in the UFTA claim, there was an initial transferee defense which shut down that UFTA claim. And so there were — you could have an inconsistency. Similarly, in In re Valenti, there was no — there was an issue with an underwater house in the asset. It couldn't qualify as an asset under Tufta. So there was a defect in the Tufta claim allowing the unjust enrichment claim to go forward. In this case, we don't have that. The unjust enrichment claim and the Tufta claim are going to be considering the same exact facts. And because of that, it would be duplicative to have the Court determine — it was not error for the — for the district court to grant summary judgment. And there was also — yes? Those cases are in your brief? Yes. And they're in the receiver's brief. Oh. And I have just a few seconds. I wanted to underscore on the quasi-estoppel argument. Judge Godbee correctly determined, based on the facts presented at trial, that there was no inconsistency in the Magnus party's tax filings. And there's also no mutuality of parties. And I wanted to point out specifically in the tax filings, it says that the Magnus party's — in October of 2008, comma, the taxpayer received funds, period. And so that temporal limitation in the tax filings is limited to in October of 2008. It then continues to say, due to the investigation of Stanford that was active in 2008, the taxpayer was concerned. And so I will just finish by saying that second sentence is limited by the concerns regarding Stanford that were active in 2008. Thank you. Thank you. All right. Back to you, Mr. Young. Thank you, Judge Stewart. Just a few quick points. First, on judicial estoppel that my colleague on the other side mentioned, in the Magnus party's supplemental record excerpts, the Alguire order that's mentioned by both parties, you can look at pages 4 to 7 of that, and it describes, it's Judge Godbee explaining why the argument makes no sense, the prior decisions were about whether or not the receiver himself could possibly have discovered these claims. Our contention, of course, is that Magnus was in a very different situation. That's the whole point of the good faith claims. Secondly, no circuit has adopted in Tufta, as far as I know, I don't think even in bankruptcy, Section 548, any futility exceptions. For all the reasons that I articulated, it would actually undermine both provisions. But by rejecting it as a matter of Texas law, the Texas legislature means what it says, actual good faith. The Court would certainly not bind itself to construing a different statute. GE Capital says the two things are not overlapping coterminous. You'd have the opportunity to consider it in a bankruptcy case. And I doubt that you'll adopt the futility exception there, but you would be free to do so if you so wished. Third, even if it were true that it were impossible for Magnus to discover the Ponzi scheme, and even if futility were indeed a valid exception to the good faith defense, it was still prejudicial error for limiting that question to Ponzi schemes for reasons that we've discussed. The record does indeed, I think all of us would agree, unambiguously confirm that it was a Ponzi scheme. But as I mentioned, Tufte has focused on what the transferee could have known at the time of the transfer, not what turned out to clearly be the case later. The receiver said, I knew it was a fraud, but it took him a while to discover that it was a Ponzi scheme, and that's something that we wouldn't expect Magnus to necessarily have a crystal ball about. But the record shows plenty of circumstances in which he knew in October 2008, when the jury, after all, found that he was on inquiry notice of a Ponzi scheme, that he could have certainly been on actual notice of insolvency or fraud of some different sort. I would say that both parties asked for fraud or insolvency in the instruction. This was not something that Magnus and the receiver were actually differing about. It was the district court that replaced it with Ponzi scheme as the instruction for the jury. And I'm a little confused about the idea that we didn't object. You can look in the record excerpts to the receiver's objections to the court's charge to the jury, 11658, 1169 of the record, our objections to questions 1A and 1B said that you need to ask whether there was inquiry notice that Stanford was engaged in a fraud or was insolvent. We also object on the Ponzi scheme instruction. That's point two of our objections. Making a Ponzi scheme the exclusive test for the jury, however, rather than SIB's fraud or insolvency would unduly focus the jury on that single way to defeat good faith and would give the jury the mistaken belief that the Magnus defendants could have received the transfers in good faith despite concluding that Stanford was engaged in a fraud or was insolvent. I think that that objection was amply preserved, and in fact, you'll get tired of seeing it if you look through the record. Two more very quick points on unjust enrichment. It's often brought in tough to cases. I don't really know what the idea about a principal clawback was, but I think that it begs the question a bit. The whole point of a Ponzi scheme is that it's not your own principal. That was the first error that I mentioned that the district judge made, and this is just collapsing into that same mistake. And if it's not your money, as Your Honor's question, I think, articulated, then you're taking it all and pretending that it is means that when the music stops, somebody else is going to say, well, it was actually my money. I also put in, much less than Magnus, he put in a lot of money, but others put in some and now they can't get it, but they would have equally the same claim to say, it is my money. And if it's not your money, and Mr. Magnus takes it despite it not being his money, then everybody else tries that, and they will say, you've got my money. That is the very definition of an unjust enrichment claim. And lastly, I will end by turning back to the good faith definition, which is objective faith. If someone sits on the lazy boy and does nothing, it doesn't matter what their subjective reason for it is objectively as a matter of law in order for Tufted to work. That is deemed bad faith, not good faith. The futility exception makes the riskiest thing that somebody can do to conduct a diligent investigation, because by not doing so, you avoid actual notice, and then you can do what Magnus has done 10 years later. 10 years and a month right now later, try to get a jury to say, oh, it would have been futile. Nobody sensibly would conduct a diligent investigation under those circumstances. All right. Thank you. Thank you. Both sides, robust case to say the least, but we'll give it our best shot to unravel it. All right. Before we take up the last case for the morning, we'll stand in a short recess.